UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

FRANCES COLLAZO,

                    Plaintiff,                         Case No. 1:23-cv-11849

v.                                                     Honorable Thomas L. Ludington
                                                       United States District Judge
OTSEGO COUNTY, et al.,

                    Defendants.
_____/

**OPINION AND ORDER (1) GRANTING DEFENDANTS JOSHUA BURLESON,
JOHNATHAN WEHNER, AND COLE WRIGHT'S MOTION FOR SUMMARY
JUDGMENT, (2) GRANTING DEFENDANTS OTSEGO COUNTY AND BRIAN
LAGRANDEUR'S MOTION FOR SUMMARY JUDGMENT, (3) DENYING
DEFENDANTS OTSEGO COUNTY AND LAGRANDEUR'S MOTION TO ADJOURN
TRIAL AS MOOT, AND (4) DISMISSING COMPLAINT**

Law enforcement often responds to uncertain, high-stakes scenarios. These scenarios compel officers to make rapid judgment calls to protect the public and themselves, frequently requiring them to employ some degree of force. So the United States Supreme Court has directed courts to consider that when analyzing officers' conduct in cases challenging their uses of force: When analyzing such cases, courts must not use the gift of hindsight "in the peace of" their chambers, even if the court subjectively thinks an officer's conduct was imperfect after spending weeks poring over the record. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Rather, because officers do not get weeks to analyze the facts—they get seconds or minutes—courts must adopt the perspective of a reasonable officer on the scene and assess whether an officer's force was objectively reasonable under the circumstances. *Id.* In so doing, courts must consider "all relevant circumstances" known to the officers, "including facts and events leading up to the climactic moment" of force. *Barnes v. Felix*, 145 S. Ct. 1353, 1356 (2025). All said, in excessive force cases, context reigns supreme. *Id.* at 1358–59.

This case implicates these principles. On August 1, 2021, a neighbor reported gunshots, arguing, and shouting from Plaintiff Frances Collazo's property in Otsego County, Michigan. Multiple law enforcement agencies responded. Among the responding officers were Defendants Brian LaGrandeur, Joshua Burleson, Johnathan Wehner, and Cole Wright. Initially, the officers struggled to locate the property from which the shots were fired. Eventually, the officers deduced that the shots came from Plaintiff's home—a property known to some of them from prior domestic-violence calls involving Plaintiff and her husband.

Defendant LaGrandeur arrived before the other Defendants and saw Plaintiff standing on her deck. Plaintiff immediately and repeatedly ordered Defendant LaGrandeur to leave, while he explained that officers would not until they confirmed everyone's safety. As the conversation grew more hostile, Defendant LaGrandeur asked if Plaintiff wanted to go to jail. Moments later, after Plaintiff remained confrontational, Defendant LaGrandeur grabbed her arm to place her under arrest without announcing it.

A struggle ensued. Plaintiff resisted by grabbing the deck railing. At that point, Defendant Wehner, who had just arrived with Defendants Wright and Burleson, assisted Defendant LaGrandeur in pulling Plaintiff away from the deck railing. Plaintiff then warned them about a knee injury, and while descending the deck stairs, she briefly fell. Once on her feet, Defendants LaGrandeur and Wehner handcuffed Plaintiff, and Defendant LaGrandeur escorted her to his patrol vehicle. On the walk, Plaintiff again fell to her knees. Defendant LaGrandeur helped her up and placed her in the back seat of his vehicle. Meanwhile, the remaining Defendants continued to investigate and located spent shotgun shells and a shotgun in plain view inside the home. But— finding no signs of injury or individuals on the property—they chose not to enter the house without a warrant and concluded their investigation.

Plaintiff was charged with a felony under Michigan law for resisting and obstructing officers. At her preliminary hearing, both she and Defendant LaGrandeur testified, and the court reviewed the home-security footage. Plaintiff argued there was no probable cause to support the arrest. But the presiding judge disagreed and bound the case over to the circuit court. Roughly a year later, the charges were dismissed without prejudice based on an agreement between the prosecutor and Plaintiff's Counsel.

Following the dismissal of her state charges, Plaintiff sued Defendants LaGrandeur, Wright, Burleson, Wehner, and Otsego County. Plaintiff asserts Fourth Amendment claims against Defendants LaGrandeur, Wright, Burleson, and Wehner under 42 U.S.C. § 1983. Plaintiff also asserts a *Monell* claim against Defendant Otsego County, alleging that it failed to adequately train and supervise Defendant LaGrandeur. Eventually, Defendants moved for summary judgment. And Defendants LaGrandeur and Otsego County seek to adjourn the trial date. But as explained below, this case will not proceed to trial: Defendants are entitled to summary judgment. So Defendants' Motions for Summary Judgment will be granted, Defendants LaGrandeur and Otsego County's Motion to Adjourn will be denied as moot, and this case will be dismissed.

## I.

### A. Factual Background

#### 1. August 1, 2021, Incident

On August 1, 2021, Otsego County dispatch received an emergency call from Plaintiff Frances Collazo's neighbor. *See* ECF No. 27-3 at PageID.954. Sounding from Plaintiff's residence, the neighbor heard gunshots followed by arguing and someone shouting, "'stand down,' or something like that." *Id.* at PageID.955. Due to the seriousness of the call, multiple units

responded, including units from the Otsego County Sheriff's Department, Gaylord Police Department, and the Michigan State Police (MSP). *See* ECF Nos. 25-8 at PageID.423; 25-11 at PageID.499–500; 25-7 at PageID.333. Among the responding officers were Defendant Brian LaGrandeur, a deputy for the Otsego County Sheriff's Department, and Defendants Joshua Burleson, Johnathan Wehner, and Cole Wright, troopers for MSP. *See* ECF Nos. 25-2 at PageID.144; 25-6 at PageID.304–06.

At first, the units could not locate the precise address where the shots were allegedly fired, and they were unsure whether they faced an active-shooter scenario.[1] ECF Nos. 25-11 at PageID.501–05, 550; 25-5 at PageID.245–47; 25-7 at PageID.334–35. After investigating the neighbors' properties, the officers eventually deduced that Plaintiff's property was where the gunshots arose. ECF Nos. 25-11 at PageID.504–06; 25-5 at PageID.245–47; 25-7 at PageID.334–35. So the officers pursued Plaintiff's property—some with a "heightened" sense of security because Defendants LaGrandeur and Burleson each responded to prior domestic-violence incidents between Plaintiff and her husband, where her husband was belligerent and assaulted her. *See* ECF Nos. 25-7 at PageID.329–31, 373; 25-11 at PageID.495–96; 27-2; 25-15 at PageID.630–47; 25-5 at PageID.239–41. And during one of the prior incidents, Plaintiff's husband threatened Defendant Burleson with a shotgun. ECF No. 25-7 at PageID.330–31.

Defendant LaGrandeur arrived at Plaintiff's shortly before Defendants Burleson, Wehner, and Wright. ECF No. 25-11 at PageID.508. When Defendant LaGrandeur arrived, he saw Plaintiff

---

[1] For this case, whether someone actually fired a gun is immaterial—what matters is that the officers were under the impression that there was a fight followed by gunshots and shouting. Even so, during her deposition, Plaintiff testified that she and her husband got into a loud, "passionate exchange" because he would not stop talking to her about sex trafficking. ECF No. 25-15 at PageID.654–57, 661, 669. She also testified that around that time, her husband fired a shotgun in the air "because he's a redneck," and the gunshots were "pure and simple redneckery." *Id.* at PageID.659–61.

standing on her deck, which was connected to her house. *Id.* at PageID.509. So he got out of his car, and a home-security camera captured most of the events that followed. *See* ECF No. 25-9.

As soon as Defendant LaGrandeur exited his vehicle, Plaintiff demanded that he "need[ed] to leave," *id.* at 0:04, to which Defendant LaGrandeur responded, "What's that?" *Id.* at 0:07. As Defendant LaGrandeur approached the deck where Plaintiff stood, he noticed buckshot markings on the garage door that appeared fresh based on gunpowder residue on the garage. ECF No. 25-11 at PageID.523–24. For her part, Plaintiff again directed Defendant LaGrandeur to leave as he continued to approach. ECF No. 25-9 at 0:08.

At that point, Defendant LaGrandeur explained that the officers "need[ed] to find out what's going on." *Id.* at 0:09–0:11. Plaintiff responded that there was "nothing going on, we just got back from the grocery store," and again demanded that Defendant LaGrandeur leave. *Id.* at 0:11–0:15. Defendant LaGrandeur calmly replied, "Okay, so (inaudible) shooting guns and heard people screaming," presumably trying to explain why he was there. *Id.* at 0:15–0:17; *see also* ECF No. 25-10 at PageID.474. While Defendant LaGrandeur was doing so, Plaintiff interrupted him and restated that she "just got back from the grocery store" and "[e]verybody just needs to leave right now." ECF No. 25-9 at 0:17–0:19. In response, Defendant LaGrandeur explained that the officers would not leave "until [they] figure[d] out what's going on." *Id.* at 0:21–0:25.

At that point, Defendant LaGrandeur had reached the deck and stood on the ground surrounding it, while Plaintiff stood on the deck at its railing:



*See id.* Plaintiff replied to Defendant LaGrandeur's explanations by exclaiming, "I just told you." *Id.* at 0:25–0:26. As Defendant LaGrandeur began to respond, Plaintiff inaudibly spoke over him. *Id.* at 0:26–29; *see also* ECF No. 25-10 at PageID.474. Defendant LaGrandeur then declared that he was "telling [her] what's going to happen." ECF No. 25-9 at 0:29–0:30. Plaintiff shot back that she did not care what Defendant LaGrandeur told her; she was "telling [him] [to] get out." ECF No. 25-10 at PageID.474.

After that approximately five-second exchange, the interaction escalated. Indeed, after Plaintiff's hostility and persistent demands that Defendant LaGrandeur leave, Defendant LaGrandeur asked Plaintiff if she "want[ed] to go to jail?" ECF Nos. 25-9 at 0:33–34; 25-10 at PageID.474. Interjecting, Plaintiff asked, "For what?" ECF No. 25-9 at 0:34. Defendant LaGrandeur then declared that he would "make it happen, so just be quiet." *Id.* at 0:34–0:36. At

that point, Defendant's Wehner, Wright, and Burleson were out of their vehicle and approaching the deck, and Plaintiff again asked Defendant LaGrandeur why he said that he would take her to jail and demanded that he "tell [her] why." *Id.* at 0:36–38. Defendant LaGrandeur said "no." *Id.* at 0:38. Once more, Plaintiff demanded that she was "telling [Defendant LaGrandeur] to get off [her] property," while briefly pointing her arm past his face. *Id.* at 0:38–0:40. Then, Defendant LaGrandeur forcefully stated, "No, no, we're not because until we figure out everyone is safe, we're not going anywhere." *Id.* at 0:40–0:45. While he did so, Plaintiff exclaimed that "Everybody is safe, please leave." *Id.* at 0:44–0:45; *see also* ECF No. 25-10 at PageID.475.

The interaction then escalated again. To that end, Defendant LaGrandeur shouted, "Until we figure out what happened, we're not going anywhere." ECF No. 25-9 at 0:47–0:51. At that point, Defendants Wehner, Wright, and Burleson neared the deck. *See id.* Plaintiff began emphatically moving her arms near Defendant Lagrandeur's face while stating, "You can talk louder . . . . You're not going to intimidate me." *Id.* at 0:50–0:53. For safety reasons—namely, to avoid Plaintiff retreating inside and creating a "barricaded suspect" situation—Defendant LaGrandeur grabbed one of her arms to place her under arrest without announcing that she was under arrest. ECF No. 25-11 at PageID.552–53; ECF No. 25-9 at 0:54–0:55. As he did so, the video depicts Plaintiff latching onto the deck railing with her free arm and resisting Defendant LaGrandeur. *Id.* at 0:55. Defendant Wehner then rushed up the deck stairs and grabbed Plaintiff's free arm to assist Defendant LaGrandeur, who was pulling Plaintiff toward him while walking toward the deck stairs:



*Id.* at 0:56–1:02; *see also* ECF No. 35-4 at PageID.1686–87 (identifying the officers).

Once Defendant Wehner secured Plaintiff's free arm, he and Defendant LaGrandeur took Plaintiff toward the deck stairs. *See* ECF No. 25-11 at PageID.518. According to Plaintiff, around that time, she warned Defendants Wehner and LaGrandeur that she had recently injured her knee. *See* ECF No. 25-15 at PageID.673, 682–83; *accord* ECF No. 25-11 at PageID.520–21. As Defendants Wehner and LaGrandeur took her down the stairs, Plaintiff briefly fell—without being pushed or shoved—after which the officers lifted her. ECF No. 25-15 at PageID.683–84, 688; *see also* ECF No. 25-11 at PageID.518–19, 556.

Following that, Defendants LaGrandeur and Wehner handcuffed Plaintiff. *See* ECF No. 25-13 at 0:01–0:03. Defendant Wehner then walked away, while Defendants Wright and Burleson knocked on the front door to continue to investigate the shots-fired incident. *See id.* at 0:03–0:08. At the same time, Defendant LaGrandeur escorted Plaintiff to his vehicle. *See id.* On the way to

the vehicle, Plaintiff fell to her knees a second time, at which point Defendant LaGrandeur stopped and helped her to her feet. *Id.* at 0:06–0:12. Once on her feet, Defendant LaGrandeur walked Plaintiff the remaining distance to his vehicle and put Plaintiff in the back of it. *See* ECF No. 25-13 at 0:12–0:27.

While Plaintiff sat in the vehicle, the officers continued their investigation. *See* ECF No. 25-11 at PageID.524–27. Near the deck, the officers found spent 12-gauge shotgun casings and saw a shotgun in the house through a window. *See id.* at PageID.525–28; *see also* ECF Nos. 25-5 at PageID.261; 25-8 at PageID.448–49. But they did not see anyone in the house—injured or otherwise—and eventually contacted Plaintiff's husband over the phone. ECF Nos. 25-11 at PageID.525–26; 25-8 at PageID.448–49; 25-7 at PageID.372. So for legal reasons, the officers decided against conducting a warrantless search of Plaintiff's house, ending their investigation. ECF Nos. 25-11 at PageID.525; 25-8 at PageID.448–49; 25-5 at PageID.258–60.

### 2. Plaintiff's Resisting and Obstruction Charges and Proceedings

After the officers concluded their investigation of the shots-fired call, Defendant LaGrandeur took Plaintiff to the Otsego County Jail. *See* ECF Nos. 25-11 at PageID.531–32; 35-19. Ultimately, Plaintiff was charged under MICH. COMP. LAWS § 750.81d(1) for resisting and obstructing police officers by hindering the officers' investigation into the shots-fired call and then resisting arrest. ECF Nos. 25-12; 25-11 at PageID.532; 35-21 at PageID.1929–30; 35-8 at PageID.1734.

On December 2, 2021, the Honorable Michael Cooper of the 87-A District Court in Otsego County, Michigan, conducted a preliminary examination to determine whether probable cause existed to bind over Plaintiff's felony case to circuit court. ECF No. 25-4. At the hearing, counsel represented Plaintiff. *See generally id.* Defendant LaGrandeur testified for the State, and Plaintiff's

Counsel cross-examined him. *See id.* at PageID.170–90. During her defense, Plaintiff testified, and her Counsel played the home-security videos that captured the events. *See id.* at PageID.191–209. Plaintiff's Counsel also argued that Defendant LaGrandeur did not possess probable cause for her resisting and obstructing arrest, and thus, Judge Cooper could not bind over the case. *See id.* at PageID.211–15. But in the end, Judge Cooper found probable cause and bound over the case to the 46th Circuit Court in Otsego County, Michigan. *Id.* at PageID.216–18. And Plaintiff did not timely challenge the probable cause finding in the 46th Circuit Court. *See* ECF No. 35-18 at PageID.1903; *see also State of Michigan v. Collazo*, Case No. 2021-0000006239-FH, (46th Cir. Ct. Otsego Cnty., Mich.); MICH. CT. R. 6.008(B).

On August 2, 2022, the assigned prosecutor dismissed the charges without prejudice based on an agreement between that prosecutor and Plaintiff's counsel. ECF Nos. 35-18 at PageID.1903– 04; 35-11 at PageID.1815. According to the prosecutor, the dismissal resembled a plea deal: had Plaintiff pled guilty, the State would have recommended deferral and eventual dismissal. ECF No. 35-18 at PageID.1903–04. But because Plaintiff has "stayed out of trouble for a year" while COVID-19 backlogs delayed the case, the State agreed to drop the charges altogether. *Id.* at PageID.1904; *see also* 35-11 at PageID.1815.

### B. Procedural Background

After the State dismissed Plaintiff's resisting and obstructing charges, Plaintiff filed this case on July 31, 2023. ECF No. 1. Plaintiff brings three claims under 42 U.S.C. § 1983. *Id.* at PageID.5–9. First, she asserts a Fourth Amendment claim against all Defendants, alleging (1) Defendants LaGrandeur and Wehner used excessive force, and (2) Defendants Wright, Burleson, and Wehner failed to intervene to prevent the force. *Id.* at PageID.5–6. Second, Plaintiff asserts a Fourth Amendment false arrest claim against Defendant LaGrandeur. *Id.* at PageID.6–8. Third, she

brings a claim against Defendant Otsego County, seeking to hold it liable as a municipality under *Monell* for allegedly failing to adequately train and supervise Defendant LaGrandeur. *Id.* at PageID.8–9.

On September 16, 2024, all Defendants moved for summary judgment. ECF Nos. 25; 27. While these motions were pending, Defendants LaGrandeur and Otsego County sought an adjournment of trial. ECF No. 49.

## II.

Summary judgment is proper when no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if, based on the evidence presented, a reasonable jury could return a verdict for the nonmoving party. *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018). When seeking summary judgment, the movant must identify parts of the record showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the nonmovant to "present significant probative evidence that will reveal that there is more than some metaphysical doubt as to the material facts." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (cleaned up). Courts cannot consider a nonmovant's inadmissible hearsay evidence on summary judgment. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). Further, the mere existence of a scintilla of evidence supporting the nonmovant's position does not create a genuine dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). And courts need not accept an assertion of fact "blatantly contradicted" by the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

At this stage, courts cannot weigh the evidence presented. *Id.* at 249. Nor can courts assess the competency and credibility of witnesses. *Id.* at 255. And courts must view the evidence in the

light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Finley v. Huss*, 102 F.4th 789, 804 (6th Cir. 2024). But where, as here, a video captures the underlying events, "[t]his claimant-friendly standard . . . does not close [courts'] eyes" to the realities of such evidence. *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1167 (6th Cir. 2025). Rather, courts are "free to assess" video evidence "'in the light depicted by the videotapes.'" *Id.* (quoting *Scott*, 550 U.S. at 381).

### III.

### A. Constitutional Claims against Defendants LaGrandeur, Wehner, Wright, and Burleson

The analysis begins with Plaintiff's 42 U.S.C. § 1983 constitutional claims against Defendants LaGrandeur, Wehner, Wright, and Burleson. Defendants seek summary judgment because, they argue, Plaintiff cannot establish that Defendants LaGrandeur, Wehner, Wright, and Burleson violated her constitutional rights, and even if she could, they are entitled to qualified immunity. *See generally* ECF Nos. 25; 27.

Where applicable, qualified immunity protects government officials from civil liability. *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). It applies to Plaintiff's § 1983 claims against Defendants LaGrandeur, Wehner, Wright, and Burleson unless his conduct violated Plaintiff's clearly established constitutional rights. *Finley*, 102 F.4th at 804 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This standard implicates two questions: (1) Did Defendants LaGrandeur, Wehner, Wright, and Burleson's conduct violate Plaintiff's constitutional rights? (2) If so, were the rights clearly established on August 1, 2021? *See Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 438 (6th Cir. 2013). This Court can address these questions in any order, and "if the answer to either question is 'no,'" then Defendants LaGrandeur, Wehner, Wright, and Burleson are "entitled to qualified immunity." *Finley*, 102 F.4th at 804–05. When filtered through

these questions, none of Plaintiff's constitutional claims against Defendants LaGrandeur, Wehner, Wright, and Burleson survive summary judgment.

### 1. Fourth Amendment False Arrest

Start with Plaintiff's Fourth Amendment false arrest claim against Defendant LaGrandeur. To state a Fourth Amendment false arrest claim, a plaintiff must "prove that the arresting officer lacked probable cause to arrest the plaintiff." *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014); *Hartman v. Thompson*, 931 F.3d 471, 483 (6th Cir. 2019). So "a finding of probable cause necessarily defeats" a false arrest claim. *Jones v. City of Elyria*, 947 F.3d 905, 914 (6th Cir. 2020). As a result, to prevail on her false arrest claim, Plaintiff must show Defendant LaGrandeur lacked probable cause to arrest her for resisting and obstructing under MICH. COMP. LAWS § 750.81d(1)—which prohibits "assault[ing], batter[ing], wound[ing], resist[ing], obstruct[ing], oppos[ing], or endanger[ing] a person who the individual knows or has reason to know is performing his or her duties."

Defendant LaGrandeur advances three arguments for why he is entitled to summary judgment on this claim. First, he argues that the state court's probable cause finding during the preliminary hearing for Plaintiff's resisting and obstruction charge precludes her false arrest claim under the doctrine of collateral estoppel. ECF No. 27 at PageID.818–19. Second, Defendant LaGrandeur argues that even if her claim is not precluded, he had probable cause to arrest her for resisting and obstructing the officers' investigation. *Id.* at PageID.821–24. Third, he contends that even if he did falsely arrest Plaintiff, the arrest did not violate clearly established law. *Id.* at PageID.824–31. But because Defendant LaGrandeur's collateral estoppel argument prevails, this Court need only address that issue.

Under "the Full Faith and Credit Statute," state-court decisions may preclude relitigation of the issues underlying those decisions in federal lawsuits. *In re Calvert*, 105 F.3d 315, 317 (6th Cir. 1997) (citing 28 U.S.C. § 1738). This statute provides that "state judicial proceedings 'shall have the same full faith and credit in every court within the United States . . . as they have . . . in the courts of such State . . . from which they are taken.'" *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, (1985) (quoting 28 U.S.C. § 1738). Thus, federal courts must apply the preclusion law of the rendering state, even in § 1983 cases. *Haring v. Prosise*, 462 U.S. 306, 313 (1983) (quoting *Allen v. McCurry*, 449 U.S. 90, 96 (1980)). So here, this Court must apply Michigan law to determine whether the state court's probable cause finding in Plaintiff's preliminary hearing collaterally estops relitigation of that issue.

Moving to that question, under Michigan law, collateral estoppel applies when four elements are satisfied: (1) the parties are identical in both proceedings; (2) the first proceeding ended in a valid, final judgment; (3) the identical issue was actually litigated and necessarily decided; and (4) the opposing party had a full and fair opportunity to litigate it. *People v. Gates*, 452 N.W.2d 627, 630–31 (Mich. 1990); *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001). Importantly, Michigan permits "crossover estoppel," which allows litigants to apply criminal decisions to civil cases and vice versa. *See Knoblauch v. Kenyon*, 415 N.W.2d 286, 292 (Mich. 1987); *see also People v. Trakhtenberg*, 826 N.W.2d 136, 141 (Mich. 2012); *In re Forfeiture of $1,159,420*, 486 N.W.2d 326, 333 (Mich. Ct. App. 1992). Further, in Michigan, when, as here, collateral estoppel "is asserted defensively," the parties need not be identical. *Monat v. State Farm Ins. Co.*, 677 N.W.2d 843, 850 (Mich. 2004). Thus, the first element is removed from consideration. *See id.*

With those principles in hand, the Sixth Circuit has assessed the preclusive effects that Michigan courts' probable cause findings in preliminary hearings have on § 1983 claims. *See, e.g.*, *Coogan v. City of Wixom*, 820 F.2d 170 (6th Cir. 1987), *overruled on other grounds by Frantz v. Village of Bradford*, 245 F.3d 869 (6th Cir. 2001). In so doing, the Sixth Circuit announced a straightforward rule: In Michigan, when "an accused" contests "probable cause at a preliminary hearing," a state judge's "finding of probable cause" forecloses "relitigation of that finding in a" later "§ 1983 action." *Id.* at 175. The upshot of this rule is that when it applies, a plaintiff cannot sustain a § 1983 action for claims that require proof of a lack of probable cause, including Fourth Amendment false arrest claims. *See, e.g., Autrey v. Stair*, 512 F. App'x 572, 577 (6th Cir. 2013). But courts have acknowledged two situations where the general rule is inapplicable because an element of collateral estoppel is absent—best considered exceptions to the rule.[2]

_____

[2] Recent nonbinding decisions and Sixth Circuit dicta suggest a potential third exception in addition to the ones discussed below: when a plaintiff is acquitted and thus unable to appeal the preliminary hearing's probable cause finding, relitigation in a § 1983 action may still be permitted. *See, e.g.*, *Grady v. Crastenburg*, 769 F. Supp. 3d 609, 640–43 (E.D. Mich. 2025); *Davis v. Gallagher*, 951 F.3d 743, 749 (6th Cir. 2020) (finding in dicta that non-appealability due to acquittal "cuts against affording" preclusion after declining to apply preclusion on other grounds); *Koelzer v. Westrick*, No. 22-1835, 2024 WL 2028497, at *3 (6th Cir. May 7, 2024). This reasoning seemingly aligns with Michigan preclusion principles, which bar applying collateral estoppel when the party could not "have obtained review of the judgment in the initial action" *Monat*, 677 N.W.2d at 847 (quoting RESTATEMENT (SECOND) OF JUDGEMENTS § 28(1)). And that rule applies unless the party surrendered the right to appeal—even if the surrender was based on a "wise tactical decision." *Id.* Yet some cases, including binding decisions, have done the opposite, concluding that collateral estoppel applied when the plaintiff was acquitted. *See, e.g.*, *Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007); *Autrey*, 512 F. App'x at 582. Arguably, then, this non-appealability exception does not exist because *Peet* binds this Court and later Sixth Circuit panels unless (1) intervening Michigan case law or United States Supreme Court authority requires recognizing the exception, or (2) the Sixth Circuit overrules *Peet* en banc. *See United States v. Thomas*, 142 F.4th 412, 417 (6th Cir. 2025) ("[W]e are bound by the decisions of another panel unless there is intervening . . . authority that requires modification, or we sit en banc to overrule the panel's decision.").

But this Court will not dwell any longer on the tension in case law because Plaintiff does not argue that this potential exception applies here and has thus forfeited the argument. *See generally* ECF No. 35 at PageID.1606–09. And at any rate, Plaintiff did not timely challenge the probable cause

First, preclusion does not apply to Michigan courts' probable cause findings when a plaintiff can distinguish the issues at the preliminary examination from those in the § 1983 action. *See Darrah*, 255 F.3d at 311. Indeed, when the issues are distinguishable, the "identity of issues requirement under Michigan law has not been satisfied." *Id.* Importantly, plaintiffs can satisfy this exception by showing that an officer withheld exculpatory evidence or provided materially misleading or false information at the preliminary hearing to "color[] a state-court judge's probable-cause determination." *Autrey*, 512 F. App'x at 579. In those cases, the issues are distinguishable "because assessing whether there was evidence providing probable cause to prosecute is not always the same inquiry as assessing whether an officer falsified evidence that influenced the probable cause determination." *Davis*, 951 F.3d at 748; *Darrah*, 255 F.3d at 311; *Hinchman v. Moore*, 312 F.3d 198, 203 (6th Cir. 2002); *Buttino v. City of Hamtramck*, 87 F. App'x 499, 505 (6th Cir. 2004); *Peet*, 502 F.3d at 566.

Second, Michigan courts' probable cause findings will not preclude relitigation in a § 1983 action when a plaintiff can show that the preliminary hearing was "little more than a" formality that lacked adversarial rigor. *Coogan*, 820 F.2d at 175. For example, a preliminary hearing may lack adversarial rigor when an accused strategically forgoes cross-examining the state's witnesses at a probable cause hearing to avoid revealing his trial strategy. *Davis*, 951 F.3d at 749 (citing *Kaley v. United States*, 571 U.S. 320, 354 (2014) (Roberts, C.J., dissenting); *Vasquez v. Jones*, 496

---

finding in the 46th Circuit Court by filing a motion to quash, *see supra* Section I, A, 2, so she surrendered the right to appeal the finding. *See People v. Fleming*, 460 N.W.2d 602, 604 (Mich. Ct. App. 1990); *see also People v. Eagen*, 357 N.W.2d 710, 712 (Mich. Ct. App. 1984) (citing *People v. Miller*, 342 N.W.2d 926, 927 (Mich. Ct. App. 1983)). As a result, even though Plaintiff could not appeal the probable cause finding after her charges were dismissed, this potential non-appealability exception does not apply here because Plaintiff surrendered her right to appeal. *See Monat*, 677 N.W.2d at 847; *see also Coogan*, 820 F.2d at 175 (applying collateral estoppel to Michigan courts' probable cause finding when the plaintiff's charges were ultimately dismissed).

F.3d 564, 578 (6th Cir. 2007)). At core, this exception recognizes that in those cases, a plaintiff did not receive a "full and fair opportunity to litigate the probable cause issue." *Autrey*, 512 F. App'x at 581 (citation modified).

Here, the probable cause finding in Plaintiff's preliminary examination collaterally estops her from relitigating that issue. At the hearing, counsel represented Plaintiff and contested probable cause by cross-examining Defendant LaGrandeur, having Plaintiff testify herself, and playing the home security video that captured the underlying events. ECF No. 25-4 at PageID.170–209. Plaintiff also vigorously argued that Defendant LaGrandeur lacked probable cause to arrest her based on MICH. COMP. LAWS § 750.81d(1)'s elements. *See id.* at PageID.211–15. So because "the state afford[ed]" Plaintiff an opportunity "to contest probable cause at a preliminary hearing and" she did so, the state judge's probable cause finding precludes "relitigation of that finding" in this case. *Coogan*, 820 F.2d at 175. And that preclusion is fatal to Plaintiff's false arrest claim. *See id.*; *see also Peet*, 502 F.3d at 566; *Autrey*, 512 F. App'x at 583; *Buttino*, 87 F. App'x at 505; *Flowers v. City of Detroit*, 306 F. App'x 984, 988–89 (6th Cir. 2009); *Spencer v. Cnty. of Huron*, 717 F. App'x 555, 559 (6th Cir. 2017).

Plaintiff resists this conclusion by invoking the first exception to preclusion and arguing that Defendant LaGrandeur provided false information at the preliminary examination. *See* ECF No. 35 at PageID.1606–09. Even though she never argued this at the hearing, Plaintiff identifies several statements from Defendant LaGrandeur's preliminary examination testimony that she contends are inaccurate and mischaracterize the underlying events. *See id.* But her argument misses the mark twice over.

For starters, the judge did not rely solely on testimony at the preliminary hearing. *See* ECF No. 25-4 at PageID.216–18. Instead, the judge also reviewed and focused on the home-security

- 17 -

footage that captured the events. *See id.* In other words, the judge saw the events unfold himself and "his decision was based upon a complete understanding of the" events. *Autrey*, 512 F. App'x at 579. So the record does not support that inaccurate or mischaracterized information "formed the basis of that court's probable cause determination" about events he saw himself. *Darrah*, 255 F.3d at 311.

Moreover, the statements Plaintiff cites do not support that Defendant LaGrandeur "knowingly supplied the [state judge] with false information . . . to establish probable cause." *Id.* Indeed, most of the statements Plaintiff challenges were fair characterizations of the events. For example, Plaintiff takes issue with Defendant LaGrandeur testifying that she was "argumentative," "immediately" told him to leave, and that he told her he was conducting an ongoing investigation. ECF No. 35 at PageID.1607–08. But Plaintiff told Defendant LaGrandeur to leave within seconds of his exiting his vehicle; that is immediate. *See* ECF No. 25-9 at 0:04. Plaintiff also interrupted Defendant LaGrandeur, challenged his presence on the property, and resisted his investigation throughout the interaction; that conduct is argumentative. *Id.* at 0:04–0:56. Further, Defendant LaGrandeur repeatedly told Plaintiff that the officers were not leaving until they figured out what happened; while he may not have used the magic words "conducting an investigation," common sense suggests that he apprised Plaintiff that they were conducting an investigation.

Finally, the rest of the statements Plaintiff takes issue with are, ironically, plucked out of context or immaterial. Take Plaintiff contesting Defendant LaGrandeur's testimony that Plaintiff did not want to "follow [his] instructions," so he placed her under arrest. ECF No. 35 at PageID.1607. She argues that he never gave her explicit instructions, so Defendant LaGrandeur misled the judge. *Id.* But in context, Defendant LaGrandeur mentioned instructions in passing, and later clarified that he never gave her explicit instructions. *See* ECF No. 25-4 at PageID.174, 185.

Or take Plaintiff challenging Defendant LaGrandeur's testimony that when he first grabbed her arm to effectuate the arrest, she clung to the deck railing, stated that she was not going, and pulled away. *Id.* at PageID.1608. Plaintiff says this is false because she never told him that she was not going with him, and Defendant LaGrandeur testified in his deposition that he did not allow her to pull away. *Id.* Ultimately, whether Plaintiff said she was not going to go with Defendant LaGrandeur is immaterial when the video evidence shows that she physically resisted arrest by clinging to the deck railing. ECF No. 25-9 at 0:56–1:02. And in context, the thrust of Defendant LaGrandeur's deposition testimony about not allowing Plaintiff to "pull away" was that he did not allow her to break free and flee into her house—not that she did not physically resist him by pulling in the opposite direction when he was arresting her. *See* ECF No. 25-11 at PageID.553.

All said, Plaintiff has at most shown that Defendant LaGrandeur was an imperfect witness who did not use her preferred language to describe the events. But that is not enough. Indeed, "[a]n imperfect witness is not the same thing as a 'false' witness" and does not warrant applying an exception to preclusion rules.[3] *Flowers*, 306 F. App'x at 988.

At bottom, Defendant LaGrandeur is entitled to summary judgment on Plaintiff's Fourth Amendment false arrest claim. The state court's probable cause finding at Plaintiff's preliminary examination collaterally estops Plaintiff from relitigating probable cause in this case. Thus, Plaintiff cannot establish that Defendant LaGrandeur lacked probable cause to arrest her for resisting and obstructing, an essential element of a Fourth Amendment false arrest claim.

---

[3] On this note, Plaintiff also curiously asserts that Defendant LaGrandeur's testimony that he did not recall whether he threatened Plaintiff with jail time is a materially false statement because he did threaten to take her to jail. *See* ECF No. 35 at PageID.1608. But a witness not remembering whether he said something is hardly a false statement.

### 2. Fourth Amendment Excessive Force

Turn to Plaintiff's Fourth Amendment excessive force claim. Plaintiff brings an excessive force claim against Defendants LaGrandeur and Wehner. *See* ECF No. 1 at PageID.5–6. The Fourth Amendment protects people from "unreasonable searches and seizures." *Vanderhoef*, 938 F.3d at 276 (citing U.S. Const. amend. IV). An officer using excessive force constitutes an unreasonable seizure, thus violating the Fourth Amendment. *Id.* And where "more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020).

First, Plaintiff argues that Defendant LaGrandeur used excessive force when he effectuated her arrest. *See id.* at PageID.4. Second, Plaintiff contends that Defendant Wehner used excessive force when he helped Defendant LaGrandeur arrest Plaintiff. *See id.* Each claim is addressed below.

### a. Defendant LaGrandeur

Begin with Plaintiff's excessive force claim against Defendant LaGrandeur. For the reasons explained below, this claim lacks merit.

### *i. Constitutional Analysis*

Fourth Amendment jurisprudence "has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical" force "to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). To determine whether an officer's degree of force was excessive, courts ask whether the force used was objectively reasonable. *VanPelt v. City of Detroit*, 70 F.4th 338, 340 (6th Cir. 2023). In so doing, courts must not apply the "20/20 vision of hindsight" from the "comfort of their chambers." *Id.* (cleaned up). When push comes to shove, not "every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates

the Fourth Amendment. *Graham*, 490 U.S. at 396. Courts must instead consider the perspective of

a reasonable officer on the scene, understanding that "officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount

of force that is necessary." *Id.* at 396–97.

Adopting that perspective, courts must analyze "whether the totality of the circumstances

justifies a particular level of force." *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019). Three

nondispositive factors guide this analysis: (1) the severity of the crime at issue, (2) the immediacy

of the threat the suspect posed to the safety of the officer or others, if any, and (3) the suspect's

active resistance or evasion, if any. *Wright*, 962 F.3d at 865. Many cases "rise and fall with the

third factor." *Shanaberg v. Licking Cnty.*, 936 F.3d 453, 456 (6th Cir. 2019). But at day's end, the

analysis is "context-sensitive," and courts "must consider all the relevant circumstances" known

to the officers, "including facts and events leading up to the climactic moment" of force. *Barnes

v. Felix*, 145 S. Ct. 1353, 1356–59 (2025). Put differently, an officer's use of force "cannot be

hermetically sealed off from the context in which [it] arose." *Id.* at 1358 (citation modified). And

"[t]aking account of that context may benefit either party in an excessive-force case." *Id.* After all,

[p]rior events may show," why "a reasonable officer would have perceived otherwise ambiguous

conduct . . . as threatening." *Id.* Mindful of this context-driven directive, this Court turns to the

factors, which reveal that Defendant LaGrandeur's force was objectively reasonable.

***Severity of the crime.*** Starting with the severity of the crime, this factor suggests that

Defendant LaGrandeur's use of force was reasonable. In assessing the severity of a plaintiff's

crime, the Sixth Circuit has analyzed several relevant factors: whether (1) the plaintiff was

suspected of or committed a felony or a misdemeanor—felonies are, at the very least, moderately

severe; (2) the plaintiff was violent—violent offenses are more severe than others; (3) the plaintiff

was suspected of being involved in an underlying crime—compounding offenses can increase the severity; (4) the officers were responding to an emergency call or the plaintiff was otherwise exacerbating public safety concerns. *See Shumate v. City of Adrian*, 44 F.4th 427, 440–42 (6th Cir. 2022) (collecting cases).

Here, Plaintiff's offense was significantly severe. Generally, when a plaintiff is arrested for felony resisting and obstructing under MICH. COMP. LAWS § 750.81d(1) and is not violent, the offense is moderately severe. *See id.* But some circumstances raise the severity of Plaintiff's offense in this case. Plaintiff was argumentative, disruptive, and uncooperative during an emergency shots-fired call, enhancing public safety concerns by hindering Defendant LaGrandeur's investigation and preventing him from swiftly securing the property. *Cf. id.* And Plaintiff was a potential suspect in a serious gun-related offense, considering dispatch relayed that a man and a woman were reportedly involved in the shots-fired incident. *See* ECF No. 25-16 at 5:04–5:08. So this factor supports the reasonableness of Defendant LaGrandeur's relatively modest use of force.

***Immediacy of the threat.*** Shifting to the second factor, the immediacy of the threat Plaintiff posed to the officers, on balance, this factor favors Defendant LaGrandeur. True, on the one hand, Plaintiff was unarmed when Defendant LaGrandeur grabbed her, a fact in her favor. *See Kent v. Oakland Cnty.*, 810 F.3d 384, 391 (6th Cir. 2016). She was also nonviolent. *Id.* (holding that tasing a plaintiff was impermissible when the plaintiff was unarmed and nonviolent, posing a minimal threat to officers).

But on the other hand, Defendant LaGrandeur was responding to a shots-fired call at a location he had previously been for domestic violence matters. He also faced substantial uncertainty: he did not know if there was a nearby active shooter and had not located the firearm

or Plaintiff's husband (the basis of the prior domestic violence call that Defendant LaGrandeur responded to) after seeing what appeared to be recent traces of shotgun buckshot on the garage. Under those circumstances, Plaintiff's disruptive behavior—specifically interrupting and demanding that the officers leave while Defendant LaGrandeur attempted to investigate and secure the scene—could have exposed him to serious harm. For example, without using the relatively minor force that Defendant LaGrandeur used to arrest Plaintiff and control the situation, Plaintiff's behavior would have prolonged the investigation, creating more opportunity for the potential shooter to harm him. *See Dunigan v. Noble*, 390 F.3d 486, 493–95 (6th Cir. 2004) (pushing 59-year-old woman reasonable when officer was focused on apprehending a potentially fleeing fugitive, and the plaintiff's "presence in the midst of this situation interfered with [the police officer's] efforts to perform his duties").

Not to mention, Plaintiff, while not immediately armed, still could have harmed Defendant LaGrandeur. Again, the officers entered the property under the impression that a woman was involved, meaning Plaintiff could have been the shooter. And without grabbing her arm and arresting her, Plaintiff could have retreated inside and grabbed the unlocated firearm, thus posing an imminent threat to Defendant LaGrandeur. *See Shanaberg*, 936 F.3d at 456 (holding plaintiff was an imminent threat to officers who responded to a drunk driving call when the plaintiff may have had access to weapons based on information in the police database); *see also Walters v. Stafford*, 317 F. App'x 479, 492 (6th Cir. 2009) (holding that officer forcefully pulling bystander to ground was reasonable when responding to shots fired even after the shooter was detained because the officers had not located a firearm).

***Degree of resistance or evasion.*** Moving to the third factor, the degree of Plaintiff's resistance or evasion, this factor strongly supports that Defendant LaGrandeur used objectively

reasonable force. Relevant here, the Sixth Circuit generally places resistance into two categories: passive and active. *See Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). And this distinction matters because the category of resistance affects the amount of force an officer may use to arrest someone. *See Chaney-Snell v. Young*, 98 F.4th 699, 717–18 (6th Cir. 2024) (concluding that dating back to the English common-law, the permissible degree of force an officer could use to effectuate an arrest depended on the degree of resistance from an arrestee) (collecting sources).

Start with passive resistance. People passively resist when, without using "overtly threatening language," they are *verbally* uncooperative, insulting, or argumentative. *Shumate*, 44 F.4th at 447–48; *see also Goodwin*, 781 F.3d at 323–24. In other words, passive resistance "entails a lack of physical resistance," flight, or verbal threats. *King v. City of Rockford*, 97 F.4th 379, 396 (6th Cir. 2024) (citation modified). When someone passively resists, officers may use minimal force to carry out an arrest, so long as the force is not "gratuitous." *See Chaney-Snell*, 98 F.4th at 715 (collecting cases); *Gambrel v. Knox Cnty.*, 25 F.4th 391, 402 (6th Cir. 2022) (noting that where, as here, "officers have the right to arrest a suspect for committing a crime . . . they may use *some* force to carry out the arrest" (emphasis added)). For example, officers may grab a person's arms to effectuate an arrest, control an uncertain situation, ensure compliance, or escort an arrestee to their patrol vehicles. *See, e.g.*, *Smith v. City of Wyoming*, 821 F.3d 697, 718 (6th Cir. 2016); *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008); *Robinson v. City of Knoxville*, No. 24-5159, 2025 WL 621451, at *8 (6th Cir. Feb. 26, 2025); *Bolden v. City of Euclid*, 595 F. App'x 464, 470 (6th Cir. 2014); *Walters*, 317 F. App'x at 492. But they *may not* use substantial force like tasers or strikes when someone passively resists. *See, e.g.*, *Goodwin*, 781 F.3d at 323–28; *Shumate*, 44 F.4th at 447; *Wright*, 962 F.3d at 871.

By contrast, one actively resists arrest "by physically struggling with police, threatening them, resisting handcuffs, or acting erratically." *Moore*, 126 F.4th at 1168. When someone actively resists officers, officers *may* use substantial force—like compliance strikes (kicking, kneeing, and punching to secure compliance), muscling techniques (including takedowns), tasers, batons, and pepper spray—to arrest the person. *See, e.g.*, *Rudlaff v. Gillispie*, 791 F.3d 638, 641–43 (6th Cir. 2015) (taser or knee strikes); *King*, 97 F.4th at 396 (same); *Moore*, 126 F.4th at 1168 (collecting cases); *Ennes v. Presque Isle Cnty.*, 773 F. Supp. 3d 400, 418 (E.D. Mich. 2025) (collecting cases). But an officer must reduce the amount of force that they use to no force or minimal, non-gratuitous force once a suspect is neutralized or ceases to actively resist. *See Gambrel*, 25 F.4th at 402.

This case does not neatly fit within either category because Plaintiff's resistance fluctuated during the encounter. At first, Plaintiff passively resisted when she was uncooperative, argumentative, and disruptive, speaking over Defendant LaGrandeur and demanding that he leave despite his representation that he would not until he ensured everyone's safety. *See* ECF No. 25-9 at 0:04–0:53. Thus, at that point, Defendant LaGrandeur could only use minimal force. And minimal force is all he used when Plaintiff merely passively resisted—he grabbed her arm to effectuate his arrest and control the situation. *See* ECF No. 25-9 at 0:53–0:54. That force was objectively reasonable, especially considering the uncertain and high-stakes circumstances. *See Smith*, 821 F.3d at 718; *Slusher*, 540 F.3d at 455; *Robinson*, 2025 WL 621451, at *8; *Bolden*, 595 F. App'x at 470; *Walters*, 317 F. App'x at 492.

Once Defendant LaGrandeur grabbed her arm, Plaintiff actively resisted. Indeed, Plaintiff latched onto the deck railing and pulled in the opposite direction of Defendant LaGrandeur as he attempted to walk to the deck stairs with her arm. *See* ECF No. 25-9 at 0:56–1:02. In other words, she physically struggled with Defendant LaGrandeur while he tried to carry out her arrest—the

textbook definition of active resistance. *Moore*, 126 F.4th at 1168 (holding that one actively resists arrest "by *physically struggling with police*, threatening them, resisting handcuffs, or acting erratically" (emphasis added)). So at that point, Defendant LaGrandeur was authorized to use substantial force to complete the arrest. And while he escalated his force by forcefully pulling Plaintiff's arm when she tried to pull away, that degree of force was relatively moderate under the circumstances when compared to the force authorized in active resistance cases. *Compare* ECF No. 25-9 at 0:56–1:02 *with, e.g.*, *Rudlaff*, 791 F.3d at 641–43 (taser and knee strikes); *Jones v. City of Cincinnati*, 736 F.3d 688, 695 (6th Cir. 2012) (baton strikes); *Earnest v. Genesee County*, 841 F. App'x 957, 960–61 (6th Cir. 2021) (takedown maneuver); *Williams v. Sandel*, 433 F. App'x 353, 362 (6th Cir. 2011) (baton strikes, pepper spray, and thirty-seven rounds of a taser reasonable to subdue a suspect who was high on LSD and actively resisting arrest); *Bozung v. Rawson*, 439 F. App'x 513, 520 (6th Cir. 2011) (arm-bar takedown).

Plaintiff contends that she was not actively resisting when she grabbed the deck railing. *See* ECF No. 33 at PageID.1274. Specifically, she contends that she grabbed the deck railing to brace herself and protect her knee, which she had freshly injured on a camping trip. *See id.* But even if true, there is one problem with her argument: Defendant LaGrandeur did not know that this was Plaintiff's subjective intent for grabbing the railing—she testified in her deposition that she did not tell him about her knee injury until after that. *See* ECF No. 25-15 at PageID.682–83. Thus, because Defendant LaGrandeur could not have known that was her reason when he used force, it is irrelevant. *Barnes*, 145 S. Ct. at 1358 (noting that courts must consider only the facts "as then known to the officer" when they used force); *Reich v. City of Elizabethtown*, 945 F.3d 968, 979 (6th Cir. 2019). And to the extent Plaintiff argues that she never pulled away from Defendant

LaGrandeur when she grabbed the railing, *see* ECF No. 33 at PageID.1274, the video footage blatantly contradicts that narrative. *See* ECF No. 25-9 at 0:56–1:02.

Moreover, speaking of Plaintiff's knee injury, although unclear, Plaintiff seemingly argues that Defendants Lagrandeur and Wehner's force in ushering her down the deck stairs was unreasonable because she briefly fell after she told them about her injury. *See* ECF No. 33 at PageID.1261. But the officers were entitled to minimal force to take her down the stairs, handcuff her, and take her to Defendant LaGrandeur's patrol car. *See Smith*, 821 F.3d at 718; *Slusher*, 540 F.3d at 455; *Robinson*, 2025 WL 621451, at *8; *Bolden*, 595 F. App'x at 470; *Walters*, 317 F. App'x at 492. Further, nothing in the record suggests that the officers applied gratuitous force that caused Plaintiff to fall. In fact, Plaintiff testified in her deposition that neither officer administered a gratuitous shove or push. *See* ECF No. 25-15 at PageID.683–84.

Despite the factors favoring Defendant LaGrandeur, Plaintiff persists. Plaintiff argues that Defendant LaGrandeur's force was unreasonable, in part, because he failed to warn her before grabbing her arm to arrest her. *See* ECF No. 35 at PageID.1616–17. As support, Plaintiff cites *Atkins v. Twp. of Flint*, 94 F. App'x 342 (6th Cir. 2004). But her reliance on *Atkins* is misplaced.

In *Atkins*, a married couple got into an argument, and the husband threatened to call 911, programming the number in his phone. *Id.* at 343. Then, he accidentally called 911, and the couple assured the dispatcher that "there was no problem." *Id.* at 344. Out of caution, the police responded to the call and went to the couple's home. *Id.*

Chaos and confusion followed the officer's investigation. After investigating, though unclear why, one officer randomly yelled, "he grabbed my balls," at which point other officers wrestled the husband—who then resisted handcuffs—to the ground without warning that he was under arrest. *Id.* at 345. The officers then sprayed him with mace and struck him in the knee with

a baton multiple times. *Id.* The husband claimed that he never touched the officer before being arrested and only resisted because he did not know why they were using force. *Id.* Further, the officers ultimately had probable cause to arrest him only for making an improper 911 call. *Id.* at 349. So the Sixth Circuit held that "twice spray[ing] and three times hit[ting] [an] arrestee with a baton" was unreasonable under the circumstances because (1) the arrestee "was not told that he was under arrest," (2) "he did not start the physical altercation," and (3) "there was no reason not to tell him he was under arrest." *Id.*

Facially, the facts in *Atkins* and this case are far from analogous. Most obviously, the degree of force used in *Atkins* dwarfs the force Defendant LaGrandeur used. Defendant LaGrandeur used relatively modest force in grabbing Plaintiff's arm and later pulling it to effectuate an arrest; in *Atkins*, the officers used substantial force in "twice spray[ing] and three times hit[ting] [an] arrestee with a baton." *Id.* at 349. And notably, the *Atkins* court *did not* quarrel with the officers wrestling the man to the ground without warning when he resisted, which is still more force than the force Defendant LaGrandeur used. Moreover, in *Atkins*, the officers provided no warning whatsoever that they would use force or arrest the husband. By contrast, although Defendant LaGrandeur did not announce that he was arresting Plaintiff right before he grabbed her arm, he asked her if she wanted to go to jail approximately twenty seconds earlier. ECF No. 25-9 at 0:33–34. In other words, moments before Defendant LaGrandeur arrested Plaintiff, he implicitly conveyed that if she remained disruptive, he would arrest her.

Drilling down one layer from those facial distinctions, a more critical contextual distinction between *Atkins* and this case exists. Specifically, the officers in *Atkins* responded to a trivial, improper 911 call, without an apparent risk to officers, and thus "there was no reason not to tell" the husband that "he was under arrest." 94 F. App'x at 349. Not so here. Here, Defendant

LaGrandeur responded to a shots-fired call—an ongoing emergency—and possessed public safety reasons for not announcing Plaintiff's arrest: announcing it would allow her to retreat inside before he could secure her, creating a "barricaded suspect" scenario or permitting her to retrieve the unlocated firearm. ECF No. 25-11 at PageID.552–53. This context also distinguishes this case from other cases where the Sixth Circuit factored an officer's failure to warn suspects before arresting them to conclude the officer's force exceeded constitutional bounds, not just *Atkins*. *See, e.g.*, *Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994); *Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009); *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017).

In sum, Defendant LaGrandeur used objectively reasonable force in effectuating Plaintiff's arrest. As a result, Plaintiff has not established that Defendant LaGrandeur violated the Fourth Amendment by using excessive force.

### ii. Clearly Established Analysis

Even if Defendant LaGrandeur used excessive force to arrest Plaintiff, it was not clearly established on August 1, 2021, so he is entitled to qualified immunity. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). This standard "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). And plaintiffs bear "the burden of showing that the right was clearly established." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022).

To meet their burden, plaintiffs must show that existing law places the "official's conduct 'beyond debate' such that any reasonable official would understand that [his] conduct was unlawful." *Finley*, 102 F.4th at 808 (cleaned up). Generally, this means plaintiffs must provide an "on-point" Sixth Circuit or Supreme Court "case showing that reasonable officers would have

known their actions were unconstitutional under the *specific* circumstances they encountered." *Bell*, 37 F.4th at 367–68 (emphasis added); *see also Chaney-Snell*, 98 F.4th at 720 ("In the fact-dependent excessive-force context," this test "requires a plaintiff to identify a highly specific right or a case with analogous facts."). And "[b]ecause unpublished cases are nonbinding, 'a plaintiff cannot point to unpublished decisions to meet his burden' of showing that a right is clearly established." *Ennes*, 773 F. Supp. 3d at 420 (quoting *Bell*, 37 F.4th at 367).

Plaintiff has not met her burden. She cites no sufficiently on-point case. Almost all the cases Plaintiff cites feature substantially more force than Defendant LaGrandeur used here. *E.g.*, *Atkins*, 94 F. App'x at 349 (multiple rounds of mace and baton strikes); *Saalim v. Walmart*, 97 F.4th 995 (yanking out of car at taser point, shoving against car, and tasing passively resistant suspect); *Smith*, 874 F.3d at 945 (leg-sweep takedown where suspect landed facedown and officer fell on top of him and rapid series of taser when suspect was not suspected of any crime and not resisting); *Goodwin*, 781 F.3d at 323 (taser when passive resistance); *Eldridge v. City of Warren*, 533 F. App'x 529 (6th Cir. 2013) (taser when passive resistance); *Shumate*, 44 F.4th at 450 (multiple rounds of tasing when passive resistance); *Lustig v. Mondeau*, 211 F. App'x 364 (6th Cir. 2006) (repeatedly twisted and jerked handcuffed plaintiffs arm who was "nonviolent and, at most, [a] passively resistant detainee while she [was] . . . restrained in a full control hold by two officers"); *Williams v. Godby*, 732 F. App'x 418 (6th Cir. 2018) (takedown of nonresistant person); *Harris*, 583 F.3d at 366 (takedown and gratuitous body strikes on nonresistant, handcuffed detainee).

Further, in most of those cases, the officers were not responding to an ongoing emergency, which deepens the distinctions between those cases and this case. *E.g.*, *Atkins*, 94 F. App'x at 349; *Saalim*, 97 F.4th at 995; *Smith*, 874 F.3d at 945; *Shumate*, 44 F.4th at 450; *Harris*, 583 F.3d at 366. And many of the cases Plaintiff cites are unpublished, so they cannot clearly establish the

unlawfulness of Defendant LaGrandeur's conduct. *E.g., Atkins*, 94 F. App'x at 349; *Eldridge*, 533 F. App'x at 529; *Lustig*, 211 F. App'x at 364; *Williams*, 732 F. App'x at 418; *Crawford v. Geiger*, 656 F. App'x 190, 193 (6th Cir. 2016).

All said, qualified immunity protects Defendant LaGrandeur from liability. Indeed, Plaintiff has not demonstrated that Defendant LaGrandeur violated her clearly established rights. Thus, Defendant LaGrandeur is entitled to qualified immunity on Plaintiff's excessive force claim against him.

### b. Defendant Wehner

Nor has Plaintiff shown that Defendant Wehner violated Plaintiff's clearly established Fourth Amendment rights by using excessive force. For starters, Defendant Wehner did not use unreasonable force on Plaintiff when assisting Defendant LaGrandeur. To that end, Defendant Wehner used no force until Plaintiff was actively resisting Defendant LaGrandeur. *See* ECF No. 25-9 at 0:56–1:02; *see also supra* Section III, A, 2, *a*, *i*. Even then, the uncontroverted evidence shows that Defendant Wehner merely grabbed Plaintiff's arm and helped usher her off the deck and handcuff her without imposing any gratuitous shoves or pushes. *See* ECF Nos. 25-9 at 0:56– 1:02; ECF No. 25-15 at PageID.683–84. Given Plaintiff's active resistance, like Defendant LaGrandeur's force, this trivial force is objectively reasonable. After all, this minimal force would be permissible even if Plaintiff were passively resisting. *Smith*, 821 F.3d at 718; *Moore*, 126 F.4th at 1169; *Slusher*, 540 F.3d at 455; *Robinson*, 2025 WL 621451, at *8; *Bolden*, 595 F. App'x at 470.

Even if Defendant Wehner's force was objectively unreasonable, qualified immunity shields him from liability. As with Defendant LaGrandeur, Plaintiff does not provide an on-point Supreme Court or published Sixth Circuit case that clearly establishes that Defendant Wehner's

conduct was unlawful. As a result, Defendant Wehner is entitled to summary judgment for Plaintiff's excessive force claim against him.

### 3. Fourth Amendment Failure to Intervene

Plaintiff's Fourth Amendment failure to intervene claim against Defendants Wehner, Wright, and Burleson also lacks merit. Under § 1983, plaintiffs may not "hold[] one officer liable for another's actions." *Chaney-Snell*, 98 F.4th at 721 (citing *Pineda v. Hamilton County*, 977 F.3d 483, 490 (6th Cir. 2020). Instead, a plaintiff may only challenge the "officer's own individual conduct." *Id.* (citation modified). And generally, "an officer's 'mere presence' at the scene of excessive force" does not "suffice to hold the officer liable for the force." *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013)).

Yet the Sixth Circuit has "held that an officer who fails to intervene to prevent another officer's excessive force can face liability for that force under § 1983"—albeit the constitutional or statutory source for this theory remains "unclear." *Id.* at 721–22 (noting that neither the Fourth Amendment nor § 1983's text "obviously cover the failure to stop" unreasonable seizures). But "[w]hatever the claim's source," the Sixth Circuit has long required a plaintiff to prove two elements for failure-to-intervene claims. *Id.* at 721. To that end, the plaintiff must show that the officer (1) "observed or had reason to know that excessive force would be or was being used," and (2) "the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Here, two facts undermine Plaintiff's failure-to-intervene claim. First, Plaintiff has not established that any officer used excessive force in the first place, meaning nothing triggered a duty to intervene. *Hunt v. Sunquist*, 822 F. App'x 468, 479 (6th Cir. 2020) ("If no excessive force was used, [an officer] cannot be responsible for failing to intervene."). Second, Defendants

Wehner, Wright, and Burleson arrived after Defendant LaGrandeur and did not witness the entire encounter between Defendant LaGrandeur and Plaintiff. *See* ECF Nos. 25-5 at PageID.256; 25-7 at PageID.345, 370–71, 378. In this way, they could not fully assess and know whether Defendant LaGrandeur's relatively modest force exceeded the bounds of reasonableness, even if his seconds-long force did.

In any event, Defendants Wehner, Wright, and Burleson are entitled to qualified immunity. Indeed, Plaintiff does not point to a single on-point Supreme Court or published Sixth Circuit case that clearly established that the Defendants Wehner, Wright, and Burleson's lack of intervention violated her rights under these circumstances. *See generally* ECF No. 33 at PageID.1276–77.

In sum, all of Plaintiff's claims against Defendants LaGrandeur, Wehner, Wright, and Burleson fail. Plaintiff did not establish a viable constitutional violation for any of these claims. And even if she did, those violations were not clearly established on August 1, 2021, so Defendants LaGrandeur, Wehner, Wright, and Burleson are entitled to qualified immunity.

### B. *Monell* Claim against Defendant Otsego County

Plaintiff's final claim, Count III, seeks to hold Defendant Otsego County liable as a municipality based on Defendant LaGrandeur's alleged Fourth Amendment deprivations. ECF No. 1 at PageID.8–9. Plaintiff argues that Otsego County failed to adequately train and supervise Defendant LaGrandeur. *Id.* But like Plaintiff's other claims, this claim lacks merit.

Section 1983 is not a vehicle for automatic municipal liability when a municipal employee violates someone's rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Indeed, local governments are not liable for their employees' misconduct unless the injury flows from the government's own unlawful acts. *Connick v. Thompson*, 563 U.S. 51, 60 (2011); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). So when a city employee violates someone's

rights, the plaintiff must tie that misconduct to a municipal policy or custom. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).

That connection can take several forms. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. at 694). A plaintiff might point to an express policy that permits the use of excessive force. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364–65 (6th Cir. 1993). But most municipalities do not codify unconstitutional conduct. *Gambrel*, 25 F.4th at 408. So plaintiffs often pivot—as Plaintiff does here—to alleging an unwritten custom; namely, that the city failed to train or supervise its employees. *Id.* That theory has limits: "to ensure that these failure-to-train or failure-to-supervise claims do not transform § 1983 into a vicarious-liability statute," in addition to showing that the municipality failed to train or supervise its employees, "the Supreme Court has required plaintiffs to prove two demanding elements." *Id.* (citing *Brown*, 520 U.S. at 405).

First, the municipality must have been deliberately indifferent to the risk that its inadequate training or supervision would lead its agents to violate constitutional rights. *Id.* Deliberate indifference is no small showing. It is a "stringent standard of fault," requiring proof that a municipal actor "disregarded a known or obvious consequence of his action." *Shadrick v. Hopkins County*, 805 F.3d 724, 737 (6th Cir. 2015) (citation modified). Put differently, the risk of the municipality's failure to train or supervise must be obvious—either because of a pattern of similar violations, or in rare cases, because the need for training was so evident that failing to provide *any* training amounts to indifference. *See Connick*, 563 U.S. at 61–63; *Canton*, 489 U.S. at 390 n.10. As a result, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 60.

- 34 -

Second, the training failure must actually cause the constitutional injury. That requires both but-for and proximate causation. *Connick*, 563 U.S. at 70; *Powers v. Hamilton Cnty.*, 501 F.3d 592, 608–11 (6th Cir. 2007). In other words, a plaintiff must show that proper training would have prevented the harm and that the municipality should have foreseen that its omission would lead to the violation. *Carey v. Helton*, 70 F. App'x 291, 294–95 (6th Cir. 2003); *Crabbs v. Scott*, 800 F. App'x 332, 338 (6th Cir. 2020). Without both, the claim fails.

At the outset, Plaintiff's failure-to-train-or-supervise claim under *Monell* suffers a fatal flaw. To that end, Plaintiff did not establish an underlying constitutional deprivation in the first instance. *See supra* Section III, A. And "there can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Scott v. Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000)); *see also Przybysz v. City of Toledo*, 746 F. App'x 480, (6th Cir. 2018) ("As a threshold matter, there can be no municipal liability under *Monell* when there is no constitutional violation").

But even if a constitutional claim against Defendant LaGrandeur survived summary judgment, Plaintiff's *Monell* claim against Defendant Otsego County still lacks merit: she has not satisfied the stringent standards for a failure-to-train-or-supervise claim. To begin, even though Defendant LaGrandeur testified that he did not receive training on the use of force "*with* Otsego" County, ECF No. 25-11 at PageID.489–90 (emphasis added), his training records blatantly contradict that, showing that in 2019, he attended and passed use-of-force training located at the Gaylord Police Department with several other officers from the Otsego County Sheriff's Department. ECF No. 27-9 at PageID.1235–37. Suppose that this training was inadequate. Plaintiff still has not established that Defendant Otsego County was deliberately indifferent to the risk that its insufficient training or supervision would lead Defendant LaGrandeur to violate Plaintiff's

rights. Plaintiff has not, for example, provided evidence that Defendant Otsego County received a pattern of complaints about Defendant LaGrandeur or other officers' use of force or false arrests. Nor has she provided proof of similar lawsuits that would have notified Defendant Otsego County that its training was inadequate. Thus, Defendant Otsego County is entitled to summary judgment on Plaintiff's *Monell* claim.

 In sum, none of Plaintiff's claims survive summary judgment. Plaintiff has not demonstrated that Defendants LaGrandeur, Burleson, Wehner, or Wright violated her clearly established rights. Nor has she shown that Defendant Otsego County failed to adequately train and supervise Defendant LaGrandeur. Thus, Defendants' Motions for Summary Judgment, ECF Nos. 25; 27, will be granted, Defendants Otsego County and LaGrandeur's Motion to Adjourn, ECF No. 49, will be denied as moot, and this case will be dismissed.

## IV.

Accordingly, it is **ORDERED** that Defendants Joshua Burleson, Jonathan Wehner, and Cole Wright's Motion for Summary Judgment, ECF No. 25, is **GRANTED**.

Further, it is **ORDERED** that Defendants Brian LaGrandeur and Otsego County's Motion for Summary Judgment, ECF No. 27, is **GRANTED**.

Further, it is **ORDERED** that Defendants Brian LaGrandeur and Otsego County's Motion for an Adjournment, ECF No. 49, is **DENIED AS MOOT**.

Further, it is **ORDERED** that Plaintiff's Complaint, ECF No. 1, is **DISMISSED**.

**This is a final order and closes this case.**

Dated: September 8, 2025                             s/Thomas L. Ludington
                                                    THOMAS L. LUDINGTON
                                                    United States District Judge